UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABBY CHAMPION et al,

                                        Plaintiffs,

        -against-

MODA OPERANDI, INC., ADVANCE
PUBLICATIONS, INC d/b/a CONDE NAST,
ADVANCE MAGAZINE PUBLISHERS, INC.
d/b/a CONDE NAST

                                        Defendants.

---

No. 20 Civ. 7255 (CM)

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

The Plaintiffs in this case are runway models. They are hired by fashion designers to exhibit items of clothing from the designers' latest collections. They do this by walking down a runway, in a glare of flashbulbs, wearing the designers' "looks," while an audience consisting of clothing retailers, journalists and fashion "influencers" watches, applauds, takes notes – and decides what and what not to buy.

The ultimate purpose of these runway shows is to sell the designer's clothes. But the direction of fashion from season to season is also deemed worthy of coverage in major newspapers (*The New York Times*, *The Wall Street Journal*), magazines (*Vogue*, *Harper's Bazaar*), and trade publications (*Women's Wear Daily*). All of these news outlets, in both their print and internet formats, feature photographs or videos of the "mannequins" (as the French call the models) parading in the designer's clothing. These pictures are generally accompanied by commentary and criticism about both the clothing and the designer's "show," as well as reaction from the audience

1

to various designs. Through the work of these publications, one can chart the evolution of fashion over time.

Among the most important publications to feature photographs and commentary about couture and designers' new collections is Vogue – a magazine occupying such an iconic place in the fashion world that it and its celebrity editor, Anna Wintour, could be lampooned to hilarious effect in the hit movie, "The Devil Wears Prada."  It is a truth universally acknowledged – so universally as to be worthy of judicial notice – that designers long to have their work featured in Vogue, and that the models who make their living exhibiting designer clothes aspire to have their photographs appear in the magazine – or, today, on its website or social media account.

So why, exactly, are Plaintiffs suing Vogue over what every model wants – having her face and form appear in Vogue or on its website?

Well, Vogue subsists, not on subscription revenue, but on the money it receives from ad sales.  Among Vogue's advertisers is an e-commerce site called Moda Operandi ("Moda"). Moda sells designer fashion – not knock offs or cheap imitations of designer fashion, but the real thing. And Moda and Vogue have an arrangement whereby consumers who are watching snippets from a particular designer's runway show on Vogue's website, and who see an item that they simply cannot live without, can click on a hyperlink and be transported to an entirely different web page – Moda's – where they can purchase the item.

Plaintiffs believe that they should be paid by Vogue for the use of their photographs if the screen on which their visages are exhibited includes a link to Moda, a particular retailer of high fashion clothing.   And they believe that they should be paid by Moda for the use of their photographs, without regard to Vogue's use of them. Their beef is not that their images are being

used for the purpose of selling merchandise, but rather that they are being used for the purpose of selling merchandise over Moda.

This sounds like a classic "right of publicity" case brought under New York's right of publicity law, N.Y. Civ. Rights Law § 50, which prohibits – for New York residents only – the "use[] for advertising purposes, or for the purpose of trade, the name, portrait or picture of any living person without first having obtained the written consent of such person."

But apparently the plaintiffs – the majority of whom lack any claim under New York's right of privacy law – prefer a federal forum. So, in what can only be characterized as a blatant effort to federalize a state law claim and extend its reach to individuals who have no rights under this state's law, plaintiffs allege that the use of footage and photographs from their runway appearances on a web page that contains a hyperlink to Moda was designed to "deceive" consumers into thinking that these 43 models endorse or sponsor the Moda as a source for the purchase of designer clothing.

Both defendants Advance Publications, Inc. and Advance Magazine Publishers, Inc. (hereinafter referred to as the Conde Nast Defendants, Conde Nast being the parent company of the entities that publish Vogue) and Moda move to dismiss the complaint – a prolix document consisting of 652 paragraphs of allegations accompanied by 754 pages of screen shots of web pages on which various of the plaintiffs are alleged to appear. But the viability of a pleading is not dependent on its length. The issue on these motions to dismiss is whether, amid all that verbiage and all of those photographs, any facts (not conclusions) are pleaded that lead plausibly to an inference that the defendants' use of photographs from the runways shows in which plaintiffs appeared violated the Lanham Act.

# BACKGROUND

## I.     Factual Background

### A.  The Parties

Plaintiffs are 43 professional models who allege that they are well-known throughout the United States and in other countries around the world.  (Compl. ¶ 293.)  At the time the complaint in this action was filed, 17 of the plaintiffs resided in New York. The remaining 26 plaintiffs resided elsewhere, some in the United States and some outside of the United States.  (Compl. ¶¶ 1-43.)

Defendants Advance Publications, Inc. and Advance Magazine Publishers, Inc., are owned by the Conde Nast Corporation. They are the Conde Nast subsidiaries that publish *Vogue* – among the world's most famous fashion magazines – and its website, vogue.com.  (Compl. ¶¶ 309, 310.) Both defendants are Delaware corporations with their principal places of business in New York.[1] Defendant Moda Operandi, Inc. ("Moda") is "an online storefront for consumers for various locations to purchase high-fashion designer items that are, inter alia, seen on the runway."  (Compl. ¶ 299.)

Moda is a Delaware corporation with its principal place of business in New York.  (Compl. ¶ 44.)  Moda advertises in Vogue and on its website.   (Compl. ¶ 489.)

### B.  Unauthorized Use of Plaintiffs' Images

Plaintiffs allege that both Vogue and Moda have published images of them modeling clothing on various runways without their consent – Moda, by publishing their images at all, and

---

[1] It may well be THE world's most famous; editions of *Vogue* are published in France, Italy, Spain, Australia, China, and Brazil, among other countries and regions. I learned to my amazement while working on these motions that there is a *Vogue: Ukraine*.

Vogue, by publishing them on web pages that include hyperlinks to Moda's website. The particulars are as follows:

In September 2019, the on-line edition of Vogue published an editorial feature about the 2020 Spring Ready-to-Wear collections ("Vogue Runway Editorial"), which included coverage of major designer fashion shows (including Dolce & Gabbana, Ferragamo, Versace, Carolina Herrera, Proenza Schouler, Loewe, Marc Jacobs, Poco Robanna, and Valentino).  The work of over 50 designers is featured in the Runway Editorial.

On the "home" page of the Runway Editorial, there appear the names of these designers. By pressing on the name of a particular designer, the visitor to vogue.com is taken to Vogue's coverage of that particular designer's Spring 2020 Ready to Wear runway show. Each designer's segment of the Runway Editorial consists of (1) its own "home" page, or cover page, into which is embedded a link to a slide show consisting of photographs from the designer's Ready-to Wear runway show, and (2) the slide show itself. On each designer's home page the reader would see a one or more photographs (but generally only one) showing a sample item from the collection, accompanied by editorial commentary about the collection and some additional photographs at the bottom of the page.  The images in the slide show consist of photographs of models, including Plaintiffs, walking the runway in the featured designer's show.

Plaintiffs have no complaint about Vogue's use of photos of their runway appearances in the Runway Editorial. Indeed, it would be hard to deem any such allegation plausible, since fashion designers covet coverage of their new collections as exhibited on the runway, and Vogue is among the premiere outlets for fashion advertising.  Interestingly, Plaintiffs plead no facts about the terms of their contracts with the designers who hire them to work the runway; the court acknowledges

the very real possibility that those contracts govern how images captured from a fashion show are used.

What Plaintiffs complain about is the fact that images appear on pages that are hyperlinked from Vogue's website to Moda's. There are two such links:

(1) The "cover" page for each designer's collection – the page through which a reader accesses the runway slide show – displays one or more selected photos from that designer's Spring 2020 Ready to Wear runway show. (McNamara Decl. Ex. C.[2])  For example, in the "cover page" photograph shown below, the model (plaintiff Martinez) is wearing clothing designed by Isabel Marant. The link to the slide show is superimposed over the featured photograph. Below that photo is a hyperlink with the text "Buy on Moda Operandi" written in very small print. A visitor who clicks on this link is taken off Vogue's website and is directed to a "trunk show" page on Moda's website that exhibits the clothing of this particular designer.  (Compl. ¶¶ 347, 348.)

---

[2] "In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and to matters of which judicial notice may be taken."  *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). The court may consider the full text of documents that are cited in, incorporated by reference in, or "integral" to the complaint. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996).



(Compl. Ex. 20.)

Also below the "cover page" photograph on all 50+ designers' "home" pages is the text describing and commenting on each designer's line, as shown below on the page for Alexander McQueen's Spring 2020 Ready-to-Wear Collection.



At the close of Sarah Burton's "pared down" yet nonetheless monumental Spring 2020 collection for Alexander McQueen, the designer took her bow trailed by a seemingly endless procession of McQueen staffers. The members of the London Contemporary Orchestra kept playing the modern classical piece composed by Isobel Waller-Bridge (sister of Phoebe) for the show. The audience kept clapping and cheering. No one rushed out of the venue, even though it was late and dinner beckoned. Time took a breather, essentially.

And, wonderfully enough, this was the message Burton hoped to achieve with her offering this season. As she wrote in her voluminous show notes, "I love the idea of people having the time to make things together, the time to meet and talk together,  the time to reconnect to the world." In practice what this amounted to was that the entire McQueen staff-not just the studio but even the HR department-completely hand-embroidered two of the dresses shown on the catwalk. Inspired by a London group called the Stitch School, which teaches boys and girls needlework, the staff sat together and chain stitched and silk knotted over the line drawings of Central Saint Martins students, who had sketched on a single giant sheet during a life drawing class at the McQueen store in London. All of those students were credited in the show notes. Talk about community spirit!

And talk about a value-rich backstory. Here are a few things one  needs  to  know about  Burton's  42 designs shown  tonight. She  upcycled lace, organza, and tulle from prior seasons. She recycled  and  reinvented  old  patterns  from  both  her  and  Alexander McQueen's  history. She worked pri mar il y with linen from Northern Ireland  and linen  made from  flax grown  at a particular  female-owned  farm-a farm  that had until recently housed livestock. She created damasks with the sole remaining linen weaver  in  Ireland.  She  created  lustrous,  light-as-paper linens with the sole remaining beetler in  Ireland  (beetling is a process in  which  linen  is covered  in  potato starch  and  then  pounded on a wood machine for hours on end). She designed embroideries of vivid, blooming endangered flowers for a dress of silk faille and an

☰ **VOGUE** RUNWAY    LATEST SHOWS    SEASONS    DESIGNERS    FEATURED

And spectacularly beautiful. This was by far the most exquisite collection of the season to date. Every piece was purposeful and important: a black evening suit with a slashed jacket to create a new spin on tails, with a lace-trimmed shirt elegantly spilling out; a simple day dress in black beetled linen with a pin-tucked bodice and exuberantly puffed sleeves; a tiny strapless frock in hand-pleated, hand-cut pale blue organza meant to resemble a flax flower; an ivory sweaterdress with a tiered skirt and sleeves knit so fine as to resemble tulle; a trench in raw linen and black wool with a flirtatious backside. There were looks that demanded a red carpet or a wedding day—an asymmetric explosion of lace and ruffles anchored by half of a tailored jacket—and others that demanded a smart office (the mos powerful suits anywhere) or a very chic day (a patched, striped shirtdress with swaggering sleeves and a sleek bodice). There was a slashed knit frock in navy for a hot date, and a draped number in ivory crochet for an even hotter one.

This is the wardrobe of which dreams are made, and it arrived in a season sorely in need of such heady imaginings. But there was nothing insubstantial going on here. Sarah Burton has always made incredibly lovely clothes for the house of McQueen; she just has that very rare **gift**. But in the past few seasons, and tonight more than ever, she proved something far, far lovelier. When you make things with the right **values**, when you treat the earth and its citizens and their traditions with care and respect, when you endeavor to reimagine what might once have been tossed aside or away, when you take the time to truly care about every piece you create, you simply make better things. With great thought comes great beauty—magnificence, really. This was the lesson in sustainability that every corporate leader in fashion needed to be taught. Tonight they went to stitch school with Sarah Burton

## COLLECTION

  

(McNamara Decl. Ex. C.)

(2) The second link is found when the viewer clicks through the designer's slide show on

Vogue's website (in the above example, by pressing on the red box that says, "View

Slideshow," which appears over the model's picture). Each slide contains a photograph

of one item of clothing from the designer's collection, as it was seen on the runway (which means, being worn by the model). When viewed on a computer, a small red box containing the words "Shop This Look" in white print is superimposed over the bottom of the photograph. (Compl. ¶ 345.)  When the slideshow is viewed on an iPhone, the red "Shop This Look" box appears at the bottom of the screen.  (Defs. Br. Fig. 2.)  The box does not identify Moda or any retailer; but it contains a hyperlink, and visitors who click on the link are sent to "trunk show" of the designer's collection on the Moda website, where the viewer can purchase the item. (Compl. ¶ 346.)



(Compl. Ex. 1.) (Depicting a slide of plaintiff Champion wearing a look from designer Proenza Schouler.)

Those two links are on Vogue's website.

When a visitor goes to Moda's website – either directly, by typing in modaoperandi.com, or by linking to Moda's site via vogue.com – and enters the "trunk show," she can view photographs of models wearing a particular designer's clothing on the runway.[3] The visitor can purchase the desired item through Moda by clicking on a photograph of the item and adding it to her cart.

There is no suggestion in the complaint that Moda lacks permission from the designers to sell the items shown in its "trunk shows." Instead, the gravamen of Plaintiffs' complaint is that these 43 models did not consent to the use of their photos (1) on Moda's website; or (2) on Vogue's website if a hyperlink to the Moda website appears on the same page as their photos. Plaintiffs allege that these uses of their images violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in that defendants created the false impression that the models (as opposed to Vogue, or Moda) are suggesting that consumers purchase the designer's clothing from Moda, as opposed to from some other retailer.

Plaintiffs also allege that all defendants violated Sections 50 and 51 of the New York Civil Rights Law by using their names and likenesses for trade or advertising purposes without having obtained prior written consent.

C. *These Proceedings*

Plaintiffs filed the complaint in the present action on September 4, 2020.  (Dkt. 1.)  Conde Nast and Moda moved separately to dismiss the complaint under Federal Rule 12(b)(6) for failure to state a plausible claim for relief.  (Dkts. 19, 22.)

---

[3] There are also photographs of clothing not being worn by models, but that is not relevant to this lawsuit.

**DISCUSSION**

**II.      Legal Standard: Rule 12(b)(6)**

To survive a motion to dismiss made pursuant to either Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating whether the Complaint meets this standard, the Court must accept all factual allegations as true and draw all *reasonable* inferences in Plaintiff's favor. *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court is not, however, obligated to accept as true legal conclusions couched as factual allegations. *Rolon v. Hennenman*, 517 F.3d 140, 148–49 (2d Cir. 2008); *see also Iqbal*, 556 U.S. at 678. Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).  The court may consider the full text of documents that are cited in, incorporated by reference in, or "integral" to the complaint.  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996).

Of critical importance, the complaint must allege facts that, if proved, would tend to show that the plaintiff has a viable claim under each of the statutes under which she sues. Focusing for

the moment on their federal claim – the only claim that gets these non-diverse plaintiffs into this court – mere conclusory allegations about "likelihood of confusion" or "misleading representation of fact," which are necessary elements of any Lanham Act claim, are insufficient to create a plausible inference that defendants have violated that statute. Put otherwise, after *Twombly* and *Iqbal, ipse dixit* pleadings are no longer sufficient to withstand a motion to dismiss. Plaintiffs must plead facts that would, if believed, give rise to a *plausible* inference that defendants violated that statute. This differs from a motion for summary judgment, where a court must decide whether the evidence submitted gives rise to a genuine issue of fact.

So it is to the complaint's allegations that I now turn.

### III.    Lanham Act Claims

Plaintiffs allege that all Defendants violated Section 43(a)(1)(A) of the Lanham Act. (Compl. ¶ 54.)  More specifically, they allege that the use of their photographs on pages on the Vogue website that link to Moda's website has caused consumer confusion by falsely suggesting the plaintiffs' endorsement of Moda as a source for purchasing the clothes they modeled.

### A.  Applicable Law

Section 43(a)(1)(A) of the Lanham Act provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1). Section 43(a) is not designed to protect the commercial interest of individuals who may be depicted in advertisement. Most important for our purposes, the Act does

13

not afford any cause of action for failure to pay someone for the use of an image. That presents

only an issue of state law. The Lanham Act only protects the consuming public from being

confused about affiliations and endorsements that might make a difference to their decision to

purchase a product.

Cutting to the chase, Plaintiffs contend, in their unnecessarily long complaint, that the use

of photographs in which they are wearing designer clothes that they exhibited on the runway in

the manner described above is likely to cause consumers be confused or to draw the mistaken

inference that (1) the plaintiff models are affiliated, connected or associated with Moda's brand,

and that (2) the plaintiff models endorse or promote consumers' use of Moda as a venue for buying

the clothes they are wearing.

The identifier for this sort of claim is "false endorsement."

### B. All Plaintiffs' False Endorsement Claims Against Conde Nast Are Barred By the First Amendment.

The reach of Section 43(a) is limited by the First Amendment and depends on whether the

challenged use is commercial speech or an expressive work. *Brown v. Elec. Arts, Inc.*, 724 F.3d

1235, 1239 (9th Cir. 2013). "Ordinarily, the use of a trademark to identify a commodity or

business 'is a form of commercial speech and nothing more.'" *Silverman v. CBS Inc.*, 870 F.2d

40, 48 (2d Cir. 1989) (quoting *Friedman v. Rogers*, 440 U.S. 1, 11 (1979)). "In the area of artistic

speech, however, enforcement of trademark rights carries a risk of inhibiting free expression." *Id.*

(internal citation omitted).

Recognizing the need to balance the First Amendment interest in free expression against

the public's interest in being free from consumer confusion about affiliation and endorsement, the

Second Circuit created a test – known as the "*Rogers* test" because it was devised in the case of

*Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) – to balance the two potentially conflicting

interests. In *Rogers*, legendary screen actress Ginger Rogers sued the producers and distributors of *Ginger and Fred* – a movie about two fictional Italian cabaret performers who imitated Rogers and her frequent dancing partner Fred Astaire. *Rogers,* 875 F.2d at 996–97. Among Rogers' claims was that the use of her name in the title of the movie violated § 43(a) by creating the false impression that she was involved with the film. *Id.* at 997.

Recognizing that enforcing § 43(a) in this context might constrain free expression in violation of the First Amendment, the Second Circuit asserted that the Lanham Act should be "appl[ied] to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999. The *Rogers* court held that the Lanham Act was inapplicable to "artistic works" as long as the defendant's use of the mark or other identifying material is (1) "artistically relevant" to the work and (2) not "explicitly misleading" as to the source of content of the work." *Id.*

The Second Circuit has expanded the *Rogers* test to apply whenever the "unauthorized use of another's mark is part of a communicative message and not a source identifier," *Yankee Publishing Inc. v. News America Publishing Inc.*, 809 F. supp. 267, 275-76 (S.D.N.Y. 1992). It applies specifically to "commentary, . . . news reporting or criticism" *see Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 495 (2d Cir. 1989); *United We Stand Am. Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.2d 86, 93 (2d Cir. 1997) (internal citations omitted) – i.e., content that cannot be deemed purely commercial.

Vogue's use of photographs taken of plaintiffs modeling designer clothing in runway shows easily falls within the safe harbor of the *Rogers* test.

1.  <u>Vogue's Runway Editorial Feature Is An Expressive Work</u>

The Rogers test applies to expressive works. Vogue's Runway Editorial is an expressive work.

The Court does not question the undeniable fact that the reference to "Buy on Moda Operandi" on the "home" page of each designer's segment of the Runway Editorial, as well as the "Shop This Look" link to Moda's website on the individual pages of the slide show, have a commercial purpose: selling the designer's clothing, and doing so through an advertiser whose patronage pays for the Runway Editorial.

But the purpose of the Runway Editorial, viewed as a whole, is not commercial. It is, rather, to report and comment on the season's various runway collections.  The opportunity to purchase clothing is made available to the reader, but only in the context of a preview of the designer's entire collection and journalistic commentary on that collection. The commercial hyperlinks occupy but a small fraction of each page of Runway Editorial; the words "Moda Operandi" are barely visible on the cover page and are not seen at all on the photographs of the individual designs in the slide show.

The Supreme Court has directed courts to apply common sense when evaluating a work for expressive content. "Common sense tells us that this is not a simple advertisement." *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001) (citing *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1976)). It is a work of fashion journalism that, like every fashion magazine, happens to contain advertisements.

Plaintiffs urge the Court to ignore the overall context of the Runway Editorial and the commentary that appears on each designer's "home" page within the Editorial, and to focus only on the fact that the words "Buy on Moda Operandi" and "Shop This Look" appear somewhere on

16

the page. They argue that these advertisements for Moda cannot be viewed as incidental to or inextricable from the use of the images in the editorial, because one could not delete them without altering the content of the editorial.

But Plaintiffs miss the point. The Runway Editorial unquestionably has both journalistic and commercial aspects to it, but it is plainly an "expressive work" as that term is understood in First Amendment jurisprudence. So the question is not whether this journalistic feature could have run without including advertiser links; it is whether the photographs used by Vogue in the Runway Editorial are both artistically relevant to the journalistic (non-commercial) aspects of the expressive work and are not explicitly misleading.

2.  The Use Of Plaintiffs' Images Is Artistically Relevant

The threshold for "artistic relevance" is deliberately low and will be satisfied unless the use "has *no* artistic relevance to the underlying work *whatsoever.*" *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (emphasis in original) (quoting *Rogers,* 875 F.2d at 999); *see also Rock Star Videos, Inc.,* 547 F.3d at 1100 (holding that under *Rogers,* "the level of relevance merely must be above zero"). The artistic relevance prong ensures that the defendant intended an artistic – *i.e.*, noncommercial – association with the plaintiff's mark, as opposed to one in which the defendant intends to associate with the mark to exploit the mark's popularity and good will. *Louis Vuitton*, 868 F. Supp at 178.

Here, there can be no question that Vogue's use of the plaintiffs' photographs, taken on the runway, in a summary document about the season's new fashions intends an "artistic" and non-commercial purpose. The use of photographs of Plaintiffs walking the runway, modeling the designers' clothing at the major fashion shows during which new looks are introduced, is unquestionably relevant to the ideas conveyed in the editorial commentary on the fashions of the

upcoming year. Indeed, it is all but impossible to imagine the Vogue 2020 Ready to Wear editorial without any photographs of the runway shows that are being described and critiqued. There is no better way to aid the reader in understanding the collections and Vogue's commentary than to see pictures from the runway shows; and those pictures will necessarily include the models, whose headpieces, hair, and makeup are an integral part of any runway show.  Nothing about the Runway Editorial suggests that Conde Nast included the photos of Plaintiffs in order to exploit their purported renown for its commercial purposes – or for any reason other than to illustrate the clothing that was being exhibited in the runway shows, which are themselves newsworthy events, and to make the commentary in the world's leading fashion magazine intelligible.

The use of Plaintiffs' photographs thus satisfies the "artistic relevance" prong of the *Rogers* test.

### 3.   The Vogue Runway Editorial Feature Is Not Explicitly Misleading

Conde Nast's use of Plaintiffs' likenesses is unprotected only if it "explicitly misleads as to the source or content of the work." *Rogers*, 875 F.2d at 999.  The relevant question is whether the defendant's use of the mark "is misleading in the sense that it induces members of the public to believe [the work] was prepared or otherwise authorized" by the plaintiff.  *Louis Vuitton*, 868 F. Supp. 2d at 179 (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993)).  Although this determination is based on the same considerations as the likelihood of confusion factors for trademark infringement, only a "particularly compelling" finding of likelihood of confusion can overcome the First Amendment interests.  *Twin Peaks,* 996 F.2d at 1379.

Here no such particularly compelling facts are alleged. Nowhere does the Vogue Runway Editorial Feature – in the body of the editorial or by positioning the words "Buy on Moda

Operandi" below a photo of a model – ever explicitly misrepresent that Plaintiffs endorsed Moda as the seller of the clothes they modeled or are in any way affiliated with Moda.  Indeed, except on the "home" page for each designer's segment on the Runway Editorial, there is no reference to Moda on any of the plaintiffs' photographs – the words "Moda Operandi" do not appear at all on the pages of the designer's slide show. The only things that are explicitly represented on the allegedly offending pages are (1) this model wore this item of this particular designer's clothing in a publicly viewed runway show, and (2) the viewer can purchase this particular item of clothing by pressing a link that takes her to some other website (since Vogue, as every reader knows, sells magazines, not clothes). These are not misrepresentations – they are true facts. Any physical proximity between the pictures of Plaintiffs and either an explicit reference to Moda (which occurs only on a designer's home page) or a link to Moda (which does not identify the retailer by name) is insufficient to create an explicit link between the Plaintiffs and Moda.

For this reason, Conde Nast's use of the photographs that are the subject of the complaint does not run afoul of the second prong of the *Rogers* test, either.

And since Vogue's use of the photographs falls comfortably within the parameters of the *Rogers* test, Plaintiffs have no viable false endorsement Lanham Act claim against Conde Nast predicated on that use. For that reason, every plaintiff's federal claim against Conde Nast must be dismissed.

### C. *Certain Plaintiffs' Lanham Act Claims Against Conde Nast Also Fail to State a Claim On Which Relief May Be Granted*

While the immediately preceding discussion disposes of any Lanham Act claim that is asserted against Conde Nast, the claims of 37 of the plaintiffs against Conde Nast must also be dismissed because these plaintiffs have failed to plead any facts tending to demonstrate that Vogue

has created any likelihood of consumer confusion about their relationship, or lack of relationship, to Moda.

To state a claim for false endorsement, a plaintiff must allege four things: that the defendant "(1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." *Burck v. Mars, Inc.*, 571 F. Supp.2d 446, 454 (S.D.N.Y. 2008).

There is no question that Conde Nast is engaged in commerce, and that the photographs were displayed on its website in connection with the sale of its "magazine" (if I may use that old-fashioned term to describe the business of Vogue) and also the sale of its advertisers' wares. So there is no question that the first and third elements of a Lanham Act claim are sufficiently pleaded as against the Conde Nast defendants.

The issue on the motion is whether the complaint contains allegations of fact that would, if believed, tend to prove the second and forth elements. As to the 37 models whose photographs appear only in the slideshows that are posted on vogue.com, the answer is no.

Courts in the Second Circuit typically weigh the eight *Polaroid* factors to determine whether there is a likelihood of confusion. *See Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). Because the *Polaroid* factors were never intended to be used in false endorsement cases, not every factor is relevant to the analysis of a pleading asserting such a claim. In a false endorsement case, only six of the eight factors are potentially relevant: (1) the plaintiff's level of recognition, (2) similarity of the plaintiff's likeness to the likeness used by the defendant, (3) actual confusion, (4) the bad faith of the defendant in adopting the mark, (5) sophistication of consumers, and (6) proximity of the marks – the "mark" in this case being the plaintiff's face.

*Jackson v. Odenat*, 9 F. Supp. 3d 342, 356 (S.D.N.Y. 2014) (citing *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982).

Moreover, courts are split on whether the proximity factor – which is even relevant in a celebrity endorsement case; some in this circuit consider only the first five listed above. *See, e.g., A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 310 (S.D.N.Y. 2019); *Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, No. 10 CV 2333(KMW), 2013 WL 822173, at *20 (S.D.N.Y. Mar. 6, 2013). I agree with those courts that conclude that the proximity factor is not relevant in a celebrity endorsement case; proximity is a function of competition, which is the usual gravamen of a Lanham Act claim, and in a false endorsement case competition between the plaintiffs and the defendant is simply not an issue. That is because, in a false endorsement case, the plaintiffs are "selling" one thing – their reputations – and defendants are selling something entirely different – in this case, on-line "magazines" and designer clothing.

"The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused" about the plaintiffs' endorsement of the defendant's brand. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (quoting *Star Indus. V. Bacardi & Co., Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005)). Accordingly, when it comes to weighing the Polaroid factors, not every one of the five applicable factors needs to be given equal weight.

Therefore, once a Court has determined, on a 12(b)(6) motion, "that it is implausible that a viewer would be confused[,] . . . it need not 'slavishly recite the litany of all eight *Polaroid* factors.'" *Roberts*, 229 F. Supp. 3d at 253 (quoting *Orient Exp. Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 654 (2d Cir. 1988)). The implausibility of consumer confusion is enough to warrant dismissal of a Lanham Act false endorsement claim.

"Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods." *Pirone v. MacMillan, Inc.,* 894 F.2d 579, 584 (2d Cir. 1990). For that reason, Lanham Act claims often survive motions to dismiss.

"But where Plaintiff 'cannot possibly show confusion as to source or sponsorship' claims can be dismissed as a matter of law." *Roberts v. Bliss*, 229 F. Supp. 3d 240, 251 (S.D.N.Y. 2017) (citing *Pirone*, 894 F.2d at 585; *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 116 (2d Cir. 1984)). "In the context of a motion to dismiss, courts have disposed of trademark claims where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work." *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.,* 868 F.Supp.2d 172, 183 (S.D.N.Y. 2012); *see also Gottlieb Dev. LLC v. Paramount Pictures Corp.,* 590 F.Supp.2d 625, 635 (S.D.N.Y. 2008).

Photographs of only six of the plaintiffs – Robinson, Arrebola, Martinez, Walton, Eirud, and Abdi – are depicted on individual designer "home" pages in the Runway Editorial, and the only place that Moda's name appears on the vogue.com website is on those "home" pages. The other 37 plaintiffs' photographs are part of slide shows; and the word "Moda" appears nowhere on the pages of the slide show. There is a box superimposed over the picture of the model wearing an item of clothing, but all it says is, "Shop This Look." (*See, e.g.*, Compl. Ex. 1.)

Lanham Act claims against Vogue predicated on the "Shop This Look" hyperlink fail to state a claim on which relief can be granted, because Plaintiffs have not plausibly alleged that this use of their images either (1) contains a misleading representation that they endorsed Moda, or (2) is likely to cause consumer confusion about the plaintiffs' relationship to or endorsement of Moda. That is because the word Moda appears nowhere on the screens containing plaintiffs' images. The

hyperlinked box does not mention or refer to Moda, either by name or logo.  Nothing about the phrase "Shop This Look" suggests that Moda is the place where the consumer can buy the garments she desires.  A consumer viewing the slideshow would have no clue, from the photo and superimposed text, that Conde Nast was directing the viewer to Moda's website – as opposed to Saks Fifth Avenue's, or Bergdorf Goodman's, or Neiman Marcus', or any other specific outlet's. For all the consumer knows, the hyperlink might connect to Amazon – or directly to the featured designer's Madison Avenue store.

The only way for a consumer to discover that Moda has anything to do with "Shop This Look" is by clicking on the hyperlink – at which point, she leaves vogue.com for a different website entirely, one that is not published by Conde Nast.  No reasonable factfinder could infer that a consumer who was browsing through one of the Vogue Runway Editorial slideshows decided to click on "Shop This Look" because she thought the model wearing the outfit she liked had anything to do with *Moda*.  And that is the end of any Lanham Act claim against Conde Nast relating to "Shop This Look."  *See Albert v. Apex Fitness, Inc.*, No. 97 Civ. 1151(LAK), 1997 WL 323899, at *1 (S.D.N.Y. June 13, 1997).

The only inference that can plausibly be drawn from the pictures of Plaintiffs containing a "Shop This Look" link is that Plaintiffs are associated or affiliated with the clothes they modeled and/or the designers who created them.  *See Pelton v. Rexall Sundown, Inc.*, No. 99 CIV 4342 JSM, 2001 WL 327164, at *6 (S.D.N.Y. Apr. 4, 2001).  But Plaintiffs do not complain of that – and for good reason.  Plaintiffs were employed by the designers to model their clothing. They presumably have contracts with those designers that govern the use of their images from the runway shows.  They plead nothing about those arrangements.  They do not protest the appearance of their visages on vogue.com.  They do not plead ignorance of how the fashion world works; they

23

allege that they are represented by modeling agencies. It is not plausible to infer that Plaintiffs do not approve of the use of their images to sell clothing generally, because that is what models are hired to do. Simply by walking the runway wearing the clothes, Plaintiffs were advertising the items for sale.

And indeed, Plaintiffs admit repeatedly in their complaint that Vogue used their images throughout the Runway Editorial, including on pages that did not contain any hyperlinks or text that might imply an association between the model and with Moda (*see, e.g.*, Compl. Exs. 10, 14, 21, 25, 35, 37, 39.).[4] So it is crystal clear that the Plaintiffs are not complaining that their images were being used to promote the sale of clothing by Vogue. Since there is nothing on Vogue's website that would cause the consumer to associate any of the 37 plaintiffs with Moda, they fail to state a claim against Conde Nast under the Lanham Act.

### D. Some Of The Lanham Act Claims Against Moda Are Dismissed and Some Are Not

The Lanham Act claims against Moda are in some ways similar to those against Conde Nast – and in some highly significant ways are not.

They are similar in that Plaintiffs allege that Moda violated the Lanham Act by using their pictures to advertise designer clothes on the retailer's website. Again, Plaintiffs contend that this use of their photographs fairly implies, in the mind of a consumer, a belief that the plaintiffs are encouraging them to purchasing the clothing they are modeling from Moda – that Plaintiffs are associated with or endorsed Moda's brand.

But they are dissimilar in that there is no question of journalism or application of the *Rogers* test to Moda's use of Plaintiffs' photographs. Moda displayed the runway pictures on its website for one reason only: to show off clothing it had for sale. The model's faces as seen on Moda's

---

[4] I assume that Moda did not have an arrangement to sell the clothing of every one of the 50+ designers whose wares are featured in the 2020 Spring Ready-to-Wear Runway Editorial.

website are not incidental to any non-commercial purpose, such that a consumer is unlikely to associate the model with Moda's brand. This casts the Lanham Act claims against Moda in an entirely different light than those asserted against Conde Nast.

Still, many of the Lanham Act claims against Moda can be dismissed.

For example, while all 43 named plaintiffs assert this claim against Moda, the complaint and the attached photographic record does not adequately allege that pictures of six of the plaintiffs appeared on Moda's website at all: plaintiffs Cleveland, Taylor, Delozier, Bui, Knorr, and Sigurdardottir. Plaintiffs admit that these models' photographs do not appear on Moda's website, but argue that Moda should be liable for the use of their photograph's on *Vogue's* website.  But since Vogue's use of the Plaintiffs' photographs is constitutionally protected and so does not violate the Lanham Act, *see supra*, pp.13-17, there is no "infringement" by Conde Nast for which Moda could be held liable to plaintiffs on a theory of "contributory infringement." Therefore, the Lanham Act claims of these six models against Moda are dismissed.

As to the remaining 37 plaintiffs: Moda, like Conde Nast, alleges that the plaintiffs have failed to plead plausibly either the second (misrepresentation of fact) or fourth (likelihood of confusion) elements of a false endorsement claim. For Moda, which lacks any protection under the *Rogers* test, the analysis of the pleading turns out differently.

Turning first to the second element, misrepresentation of fact: Plaintiffs argue that the use of their photographs on Moda's website falsely represents that the models are endorsing Moda as *their preferred* place to purchase the clothes they are modeling – in other words, that plaintiffs are working for Moda.  I confess that I view this argument as highly unlikely to succeed. However, it is least plausible that, by featuring Plaintiffs' faces on its website, Moda has created such an

impression in the minds of consumers. I cannot say on a motion addressed to the pleadings that Plaintiffs have failed to plead a misrepresentation of fact.

As to the fourth and most important element, likelihood of confusion: although 37 models have joined their claims against Moda, they are separate claims, so each plaintiff's pleading must be judged on its own merits. And while some of the plaintiffs have succeeded in pleading facts from which, at this point, likelihood of confusion might be found (subject, of course, to extensive discovery), others have not.

The court has carefully combed the hundreds of pages of pleading and attached photographs. In the images attached to the complaint, the faces of 11 of the plaintiffs – Halbert, Stoddart, Medina, Hill, Abioro, Grenville, Hartzel, Ayerdi, Meloqui, De Oliveira, and Urushadze – are effectively anonymous. The images of these models, as shown on Moda's website are either (1) cropped so that the upper half of the face cannot be seen, (2) shown from the back, or (3) indiscernible because they are part of a crowd of models.  Several examples are shown below:






(Compl. Exs. 28, 15, 19.)

These models cannot recognized by a viewer of Moda's website. These 11 plaintiffs are thus anonymous to consumers, and "the misappropriation of a completely anonymous face [cannot] form the basis for a false endorsement claim, because consumers would not infer that an unknown model was 'endorsing' a product." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 258 (2d Cir. 2021) (quoting *Bondar v. LASplash Cosmetics*, No. 12 Civ. 1417 (SAS), 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012)). Moreover, the very fact that their faces are not identifiable renders the allegation that Moda intended to trade on the good will associated with their personas totally implausible. The Lanham Act claims against Moda asserted by these 12 plaintiffs must be dismissed.

25 of the remaining 26 plaintiffs, however, have alleged facts that admit of the conclusion that the *Polaroid* factors could weigh in their favor following discovery.

The first factor – similarity – favors the Plaintiffs, since the photographs are undeniably of their faces, and the photographs are recognizably their faces – not obscured, not shown from the back, and not indiscernible in a crowd of other models.

The second factor – sophistication of audience – favors Moda, as it is unlikely that individuals who can afford to purchase designer clothing and who follow fashion design would be easily misled about what it was that the plaintiff models were, and were not, doing.

The third factor is whether the relevant consumer base recognizes the individual plaintiffs – a question the court must examine on a plaintiff by plaintiff basis.  I am prepared to concede that all but one of the plaintiffs has alleged facts from which – at the motion to dismiss stage – one could infer that their faces might be recognizable to the relevant consuming public. Twenty-five of the remaining 26 plaintiffs allege that they have been modeling for many years; that they have been used again and again by famous designers like Calvin Klein, Versace, Dior and Victoria's Secret; that their photographs have appeared repeatedly in famous fashion magazines; and that they have numerous followers on social media. Of course, none of these plaintiffs claims to enjoy the same level of fame and recognizability as the supermodels of past and present generations, such as Naomi Campbell, Christie Brinkley, Kendall Jenner or Gigi Hadid. But that is not relevant at the motion to dismiss stage; "there is a level of consumer recognition short of celebrity – as the term is usually understood – capable of causing consumer confusion." *Bondar*, 2012 WL 6150859, at *7.  The Court entertains serious doubt about whether all of these plaintiffs – each one submitting her own evidence – will be able to establish that they are recognized by the consuming public. But for now, each of these plaintiffs has alleged that he or she is sufficiently well-known to the public to survive a motion to dismiss.

The exception is Plaintiff Robinson. She has not alleged any facts from which a reasonable factfinder could infer that her face would be recognizable to the general public. Unlike the other plaintiffs, plaintiff Robinson is at the beginning of her career. The complaint identifies her as a "newcomer" who debuted in the spring 2020 fashion shows. Perhaps one day she will be as recognizable as Heidi Klum or Karly Kloss; but a model working the runway for the first time is not someone who can plausibly assert recognizability. And absent recognizability, "consumers would not infer that [the model] was 'endorsing' a product, as opposed to lending her image to a company for a fee." *Id.*; *see also Albert v. Apex Fitness, Inc.*, No. 97 Civ. 1151, 1997 WL 323899, at*1 (S.D.N.Y. June 13, 1997).

Moda's intent is another *Polaroid* factor, and the facts pleaded in the complaint admit of an inference that Moda intended to capitalize on the fame of certain of the plaintiffs. Of particular importance is the fact that Moda (unlike Conde Nast) cropped or obscured the faces of certain models in certain photographs that appeared on its website. The very fact that Moda did this supports an inference that Moda might have had an intent to capitalize on certain models' recognizability. Drawing all inferences in Plaintiffs' favor, it is plausible that Moda chose photos in which these plaintiffs' faces were visible in the hope that consumers would recognize the model in the photo and believe that the model endorsed Moda as the retailer from which to purchase the clothing. Again, the only model for whom such an inference is not plausible is Robinson, because of her lack of recognizability.

In short, enough of the Polaroid factors favor at least some of the plaintiffs so that, at this juncture, the court cannot dismiss the Lanham Act false endorsement claims they assert. The 25 plaintiffs whose Lanham Act claims against Moda remain are Champion, Arrington, Ambar Montero, Yai, Padilla, Arrebola, Christensen, Cabe, Martinez, Walton, Lineisy Montero,

Gonzalez, Hovelaken, Gunn, Bolt, Harris, Marconi, Eirud, Forrest, Li, He, Abdi, Van Erp, Pavlova, and Xu. The Lanham Act claims against Moda asserted by the remaining 17 plaintiffs are, for the reasons stated above, dismissed.

## IV.   CLAIMS UNDER NEW YORK'S RIGHT OF PUBLICITY LAW

All 43 plaintiffs assert claims against both Conde Nast and Moda under New York's Right of Publicity Law. These claims are, of course, what this lawsuit is all about. The plaintiffs do not want their photographs not to be used by Conde Nast or Moda; they want to be paid for the use of their visages in connection with the sale of the clothing they modeled. As noted above, no federal law, certainly not the Lanham Act, gives plaintiffs any such right. State law is their only recourse.

Many of the Right of Publicity claims must be dismissed because the majority of the plaintiffs are not New York domiciliaries and so enjoy no protection under New York's Right of Publicity Law. The rest are dealt with below.

### A.   The Right of Publicity Claims Asserted by Non-Domiciliary Plaintiffs Against Both Conde Nast and Moda Are Dismissed

It is absolutely and indisputably the case that an individual who does not reside in New York cannot bring a claim under New York's Right of Publicity Law. A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496 (1941); *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 316 (2d Cir.1983), *cert. denied,* 466 U.S. 963 (1984). "The New York Court of Appeals has made clear that New York Courts must apply the law of the Plaintiff's domicile to right of publicity claims." *Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 602 (S.D.N.Y. 2014).  Accordingly, a plaintiff domiciled outside of New York cannot maintain a claim for damages under Section 51.

According to the allegations of the complaint, 26 of the plaintiffs are not domiciled in New York State.[5]  Four of those plaintiffs – Gunn, Eirud, Li, and Xu – have withdrawn their claims under the New York Civil Rights Law.  Those claims are dismissed.

Four more of those 26 plaintiffs – Halbert, Delozier, Bui, and Harris – filed declarations asserting that, since the filing of the complaint (which occurred on September 4, 2020), they have moved back to New York and remain residents of the state.  (Dkts. 31, 33, 37, 43.)  Unfortunately for those plaintiffs, that will not suffice to save their claims. The complaint alleges that the offending websites were shown online in the fall of 2019. It does not allege that they have remained online continuously since they were posted. A cursory check of the web reveals that, while vogue.com continues to post the Spring 2020 Ready-to-Wear feature, the references and links to "buying the look," whether containing Moda's name or not, are no longer on the website.  And while Moda still shows these by-now-out-of-date clothes on its website – though they are no longer available for purchase – it does not appear that the photos of Delozier and Harris are still featured anywhere on the site.  (Halbert and Bui are among those plaintiffs whose photos never appeared anywhere on Moda's site, cropped or otherwise, so they have no viable right of publicity claim against Moda in any event.)

The allegations of the complaint establish that none of these four plaintiffs lived in New York on September 4, 2020. As of now, they have not pleaded any facts tending to show that, as

[5] Champion resides in Los Angeles, California.  (Compl. ¶ 1.)  Cleveland resides in New Jersey.  (Compl. ¶ 4.) Halbert resides in Florida.  (Compl. ¶ 7.)  Robinson resides in Oregon.  (Compl. ¶ 8.)  Stoddart resides in London, England. (Compl. ¶ 9.)  Delozier resides in Florida.  (Compl. ¶ 11.)  Arrebola resides in London, England.  (Compl. ¶ 12.)  Hill resides in Alabama.  (Compl. ¶ 15.)  Grenville resides in the United Kingdom.  (Compl. ¶ 17.)  Martinez resides in New Jersey.  (Compl. ¶ 20.)  Bui resides in Washington State.  (Compl. ¶ 21.)  Sigurdardottir resides in Iceland.  (Compl. ¶ 23.)  Ayerdi resides in Madrid, Spain.  (Compl. ¶ 26.)  Moloqui resides in Argentina.  (Compl. ¶ 28.)  Oliveira resides in Brazil.  (Compl. ¶ 29.)  Urushadze resides in Tbilisi, Georgia.  (Compl. ¶ 30.)  Hovelaken resides in the Netherlands.  (Compl. ¶ 31.)  Gunn resides in London, England.  (Compl. ¶ 32.)  Bolt resides in the Netherlands.  (Compl. ¶ 33.)  Harris resides in Canada.  (Compl. ¶ 34.)  Marconi resides in Germany.  (Compl. ¶ 35.)  Eirud resides in Sweden.  (Compl. ¶ 36.)  Forrest resides in Long Beach, California.  (Compl. ¶ 37.)  Li resides in China.  (Compl. ¶ 38.)  He resides in China.  (Compl. ¶ 39.)  Xu resides in China.  (Compl. ¶ 43.)

of the date on which each of them moved to New York,[6] their photos still appeared on Moda's website (for their right of publicity claim against Moda), or appeared in connection with a "Shop This look" or "Buy from Moda Operandi" link on vogue.com (for their claim against Conde Nast), they cannot plead a viable claim under New York's right of publicity law, despite the fact that they have moved into the state. Their right of publicity claims are, therefore, dismissed, albeit without prejudice to pleading facts tending to show that, on the date that each of them became a New York domiciliary and for some period thereafter, they allegedly offending photographs remained publicly available on a defendant's web page. *Cummings*, 67 F. Supp. 3d at 602.

The remaining 18 non-resident plaintiffs argue that their business ties to New York should be considered as a sufficient basis for maintaining their state law claims. However, "Domicile is 'the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir.2000)* (quoting *Linardos v. Fortuna,* 157 F.3d 945, 948 (2d Cir. 1998)). The mere fact that a majority of their modeling work takes place in New York is not sufficient to establish domicile, when the plaintiffs reside elsewhere.[7] Accordingly, the New York State right of publicity law claims brought by the remaining non-resident plaintiffs are dismissed with prejudice.

That leaves the state law claims brought by the 17 plaintiffs who are residents of the state of New York: plaintiffs Arrington, Ambar Montero, Yai, Padilla, Taylor, Medina, Christensen, Abioro, Cabe, Hartzel, Knorr, Walton, Lineisy Montero, Gonzalez, Abdi, Van Erp, and Pavlova.

---

[6] Each plaintiff needs to establish the date on which she moved into New York. The declarations of Halbert, and Delozier, filed on February 16, 2021, state only that they "currently live in New York." (Dkts. 31, 33.) Harris's declaration, also filed on February 16, 2021, states that she is "back in New York, having returned recently." (Dkt. 43.) In his declaration, Bui states that he "ha[s] been residing in Brooklyn, New York since September 2020." (Dkt. 37.)

[7] Although domicile is not synonymous with residence, under New York law, maintaining a residence in New York State is necessary for establishing domicile.

B.  *The Remaining Claims Against Moda*

Moda has not moved to dismiss the right of publicity claims of the remaining 17 plaintiffs, all of whom are residents of New York. My review of the record reveals that photographs of only 15 of these 17 plaintiffs appear on Moda's website, but as Moda has not moved to dismiss the right of publicity claims asserted by plaintiffs Taylor and Knorr, they will remain in the case for now.

C.  *The Remaining Claims Against Conde Nast.*

After the dismissal of the non-resident plaintiffs' claims under the Right of Publicity law, there remains against Conde Nast state law claims asserted by 17 plaintiffs who are New York residents – Arrington, Ambar Montero, Yai, Padilla, Taylor, Medina, Christensen, Abioro, Cabe, Hartzel, Knorr, Walton, Lineisy Montero, Gonzalez, Abdi, Van Erp and Pavlova – and depending on what facts are pleaded in an amended complaint, perhaps by as many as four other plaintiffs – Halbert, Delozier, Harris, and Bui. Conde Nast asks the court to decline to exercise supplemental jurisdiction over these purely state law claims.

When a district court has original jurisdiction over claims in a case, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III. *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C. § 1367(a)); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). Claims are considered part of the same case or controversy if they derive from a common nucleus of operative fact. *Shahriar v. Smith & Wollensky Rest. Grp. Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).  The Lanham Act and state law Right of Publicity claims asserted against Conde Nast unquestionably arise from a common nucleus of operative fact.

Section 1367(c) permits a court to decline to exercise supplemental jurisdiction if, among other things, "the district court has dismissed all claims over which it has original jurisdiction." 18

U.S.C. § 1367(c)(3). Once a district court's discretion is triggered by Section 13367(c), it may decline to exercise supplemental jurisdiction when doing so would fail promote the four values that the Supreme Court articulated in *Gibbs*, 383 U.S. at 726: economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). In weighing those factors, district courts are aided by the Supreme Court's additional guidance that "in the usual case in which all federal-law claims are eliminate before trial, the balance of factors . . . will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lunch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1988) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). The Second Circuit takes a particularly strong view that district courts should decline to exercise supplemental jurisdiction in the absence of a "clearly articulated federal interest." *See Kolari v. N. Y. Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006); *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J., concurring).

Were Conde Nast the only defendant in this case, I would not choose to exercise supplemental jurisdiction. Aside from deciding this motion to dismiss, this Court has done nothing with respect to the matter, and there is no indication that discovery has commenced.  There is no particular federal interest in overseeing claims under a New York State law that applies only to New York State domiciliaries. This Court thus lacks very little interest in continuing to preside over this matter. Rather, resolution of the state law claims – and this case really is about the state law claims – in state court will avoid "needless decisions of state law" by this Court. *Gibbs*, 383 U.S. at 726.

However, Conde Nast is not the only defendant in this case. Moda Operandi is also a defendant. Certain plaintiffs' federal claims against it have not been dismissed; and – more

significantly – the same 17 plaintiffs whose Right of Publicity claims against Conde Nast cannot be dismissed on the merits also have viable state law claims under that statute against Moda.

The claims against these two defendants are only permissively joined, under Fed. R. Civ. P. 20. Severing Conde Nast and forcing the 17 plaintiffs to bring their right of publicity claims against in in the New York State Supreme Court would not render this court incapable of according complete relief as among plaintiffs and Moda. Nor would severance as a practical matter impair or impede either Plaintiffs or Moda from protecting their interests. And there is no possibility that either Conde Nast or Moda risks incurring double, multiple or otherwise inconsistent obligations if the claims against Conde Nast go to state court, because the claims against Conde Nast and Moda, while arising under the same statute, are completely distinct in terms of liability.  Therefore, compulsory joinder (Fed. R. Civ. P. 19) is not implicated here, and this court has broad discretion to sever, including on its own motion. *Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552, 556 (S.D.N.Y. 2013) (citation omitted); see also *T.S.I. 27, Inc. v. Berman Enterprises, Inc.*, 115 F.R.D. 252, 254 (S.D.N.Y. 1987) ("Courts may order a Rule 21 severance when it will serve the ends of justice and further the prompt and efficient disposition of litigation.").

However, and not without some reluctance, I am going to retain jurisdiction over the remaining state law claims against Conde Nast. I do so solely and simply because the Right of Publicity claims against both defendants present common questions of law (though not of fact) and because I do not believe that judicial economy would be facilitated by severance. The real lack of judicial economy in this case inheres in the joinder of numerous different plaintiffs' claims solely because they arise under the same statute – not in the joinder of identical claims against two somewhat differently situated defendants. The defendants, or perhaps one of them, may have unique Right of Publicity defenses against particular models, depending especially on the contracts

that the models have with the designers who hired them to walk the runway in their designs. And retaining the claims against Conde Nast will do nothing to facilitate a settlement. But it is highly unlikely that the evidence against Conde Nast and Moda with respect to any single model's Right of Publicity claim will differ greatly, so it makes little sense to me to involve another judge – and a busy state court judge at that – in the resolution of this dispute.

## CONCLUSION

For the foregoing reasons:

1. All claims asserted by all plaintiffs under the Lanham Act, 15 U.S.C. § 1125(a), against the Conde Nast Defendants are dismissed with prejudice.

2. The claims asserted by plaintiffs Cleveland, Taylor, Delozier, Bui, Knorr, Sigurdardottir, Halbert, Stoddart, Medina, Hill, Abioro, Grenville, Hartzel, Ayerdi, Meloqui, De Oliveira, and Urushadze under the Lanham Act, 15 U.S.C. § 1125(a), against Moda are dismissed with prejudice.

3. All claims under New York's Right of Publicity Law, N.Y. Civ. Rights Law §§ 50, 51, asserted by plaintiffs Champion, Cleveland, Robinson, Stoddart, Arrebola, Hill, Grenville, Martinez, Sigurdardottir, Ayerdi, Moloqui, De Oliveira, Urushadze, Hovelaken, Gunn, Bolt, Marconi, Eirud, Forrest, Li, He, and Xu. are dismissed with prejudice

4. All claims under New York's Right of Publicity Law, N.Y. Civ. Rights Law §§ 50, 51, asserted by plaintiffs Halbert, Delozier, Harris, and Bui are dismissed without prejudice; these plaintiffs, who have admitted that they were not New York State residents when the complaint was filed,  have until October 8 to file an amended complaint asserting facts that would, if proved, demonstrate that they have any right of publicity claim under New York law that accrued after the date of the filing of the original complaint. Any amended complaint that is filed may only address these four plaintiffs' right of publicity claims; no other amendment to the complaint is permitted unless authorized by the court after an appropriate motion is made and decided.

5. The motions to dismiss are otherwise denied.

The clerk of court is directed to close the motions at dockets 19 and 22. This constitutes a written opinion.

Dated: September 22, 2021

_____

District Judge

BY ECF TO ALL COUNSEL